IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ADAM J. HAMMOND,

        Plaintiff,               14cv0847

                                  **ELECTRONICALLY FILED**

        v.

UNITED STATES LIABILITY INSURANCE
CO.,

        Defendant.

## MEMORANDUM OPINION

Presently before the Court is Defendant's Motion for Judgment on the Pleadings and its

Brief in Support . Doc. nos. 21, 22. Plaintiff (hereinafter "Hammond") filed a Response to the

Motion for Judgment on the Pleadings (doc. no. 25), but within this document he argued that

Summary Judgment should be entered in his favor. See doc nos. 24-25. The Court then ordered

that Defendant respond to the "Summary Judgment" portion of Hammond's Response.

Defendant filed its Response on January 14, 2015 (doc. no. 26), making these matters ripe for

adjudication. Counsel for both parties agreed to this procedure at the initial case management

conference held on December 18, 2014.

After careful consideration of the pleadings and the attachments to the pleadings – the

attachments being the sole evidence submitted for Motion for Summary Judgment purposes – the

Court will deny Hammond's Motion for Summary Judgment and will grant Defendant's Motion

for Judgment on the Pleadings for the reasons set forth herein.

## I.  STANDARD OF REVIEW

Defendant has filed a Motion for Judgment on the Pleadings under Federal Rule of Civil Procedure 12(c).   Under Rule 12(c), judgment will not be granted unless the movant clearly establishes that no material issue of fact remains to be resolved and that he is entitled to judgment as a matter of law.

Rule 12(b)(6), provides the standard of review applicable to motions for judgment on the pleadings and motions to dismiss.  The Court is permitted to consider, in addition to the allegations of the Complaint, "documents that are attached or submitted with the complaint, . . . and any matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, [and] items appearing in the record of the case." *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006).

Thus, in deciding a motion filed in accordance with Rule 12(c), a Court must accept the factual allegations as true and draw all reasonable inferences presented in the pleadings in the light most favorable to the plaintiff.  *Erickson v. Pardus*, 554 U .S. 89, 93–94 (2007); *Lum v. Bank of America*, 361 F.3d 217, 223 (3d Cir. 2004).  If the facts alleged by the plaintiff are sufficient to "raise a right to relief above the speculative level" such that the plaintiff's claim is "plausible on its fact," a complaint will survive a motion to dismiss, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007), or a motion for judgment on the pleadings, *Turbe v. Gov't of Virgin Islands*, 938 F.2d 427, 428 (3d Cir. 1991).

Following *Twombly* and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the United States Court of Appeals for the Third Circuit explained that a District Court must undertake the following three steps to determine the sufficiency of a complaint:

> First, the court must take note of the elements a plaintiff must plead to state a
> claim. Second, the court should identify allegations that, because they are no more

than conclusions, are not entitled to the assumption of truth. Finally, where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief.

*Connelly v. Steel Valley Sch. Dist.*, 706 F.3d 209, 212 (3d Cir. 2013) (citation omitted).

The third step of the sequential evaluation requires this Court to consider the specific nature of the claims presented and to determine whether the facts pled to substantiate the claims are sufficient to show a "plausible claim for relief." *Covington v. Int'l Ass'n of Approved Basketball Officials*, 710 F.3d 114, 118 (3d Cir. 2013). "While legal conclusions can provide the framework of a Complaint, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 664.

This Court may not dismiss a Complaint – or in this case grant judgment on the pleadings in favor of Defendant – merely because it appears unlikely or improbable that Hammond can prove the facts alleged or will ultimately prevail on the merits. *Twombly*, 550 U.S. at 563 n.8. Instead, this Court must ask whether the facts alleged raise a reasonable expectation that discovery will reveal evidence of the necessary elements. *Id.* at 556. In short, the Motion for Judgment on the Pleadings presently before this Court should not be granted if Hammond has alleged facts, which could, if established at trial, entitle him to relief. *Twombly*, 550 U.S. at 563 n.8.


## II. BACKGROUND

There are no disputes concerning the following relevant facts in the case:

From December of 2010 through December of 2011, Hammond worked as an independent contractor designing, programming, and developing computer software specializing in applications related to hazardous material ("hazmat") transportation and regulatory

compliance. Amended Complaint, doc. no. 10, ¶8. During this same period of time, Hammond served as a consultant a company known as Transportation Compliance Associates, Inc. ("TCA"). Id. at ¶ 9.

Hammond entered into a non-exclusive limited license agreement with TCA whereby he agreed to design, program, and develop (as well as provide consultation in association with) a computer system and software for TCA's use in processing hazmat transportation data owned by TCA's customer – one of the world's largest online retailers of hazmat. Id. Under this agreement, the computer system and software were to ensure the customer's compliance with domestic and international laws concerning the shipment of products sold to entities via the customer's online retail shopping website. Id. TCA agreed to compensate Hammond for his services on the basis of the number of online catalog items processed by the computer system and software. Id.

Hammond – without receiving payment from TCA, but believing that he and TCA were acting in concert as joint venture partners – began to consult with LANtek, a Pittsburgh-based software company, and directed LANtek on the designing, programming, and development, and then implementation of the computer system and software requested by TCA. Id. at ¶ 11-12. Simply stated, LANtek was to assist Hammond, and act under his direction, in developing a "new" computer system and software, which was based upon concepts and ideas that Hammond had previously developed. Id. at ¶ 12.

At some point after LANtek and Hammond began their work, Hammond was informed by his attorneys that TCA "reneged" on their promise to form a joint venture. Id. at ¶ 13. In addition, Hammond learned the TCA had begun working directly with LANtek on the "new"

computer system and software that was based on Hammond's previously developed (and proprietary) program.  Id.

On December 12, 2011, Hammond sent TCA a letter terminating his relationship with the company and threatening a lawsuit for copyright infringement.  Id.  On December 16, 2011, TCA and LANtek filed a declaratory judgment action against Hammond, and said action was assigned to this Court.  Id. at ¶ 14; see also *Transportation Compliance Associates, Inc. v. Hammond*, case no. 2:11-cv-01602-AJS (2011).  An Amended Complaint was filed by TCA and LANtek, on February 3, 2012, asserting additional claims for breach of contract, conversion, and intentional interference with existing and prospective contractual relations.  Id. Hammond notified his insurance carrier, *i.e.*, Defendant in this case, filed a claim with his insurance carrier notifying it of the lawsuit, and requested a defense and indemnification.  Id. at ¶ 14.  Defendant insurer denied his claim and thus refused to defend or indemnify Hammond.  Id.

Hammond filed a Motion to Dismiss the Amended Complaint in the earlier, underlying case, but this Court denied his Motion.  Id. at ¶ 15; see also, *Transportation Compliance Associates, Inc.,* case no. 2:11-cv-01602-AJS .  Hammond then filed Counterclaims along with his Answer to the TCA/LANtek Amended Complaint.  Id.

TCA and LANtek next filed a Motion to Dismiss Hammond's Counterclaims, which this Court granted in part and denied in part.  Id. at ¶ 17.  Thereafter, TCA and LANtek filed their Answer to Hammond's remaining counterclaim for breach of contract and requested attorney fees in their prayer for relief.  Id.  Because of the request for attorney's fees, Hammond again sought defense and coverage from his insurance carrier under a "malicious prosecution" clause of his insurance contract.  But again, the insurance carrier denied his claim.  Id.  Hammond

renewed his request for defense and indemnification under the malicious prosecution clause of his policy, but for a third and final time, his claim was denied.  Id. at ¶ 18.

Thereafter, the parties settled their claims and counterclaim in the earlier, underlying case, and on July 2, 2012, this Court approved a Motion for Entry of Final Judgment and Dismissal of the TCA/LANtek lawsuit filed against Hammond.  Id. at ¶ 19.

Hammond has now sued his insurance carrier (Defendant herein) for breach of contract and bad faith in the instant lawsuit, claiming Defendant should not have denied him coverage in the TCA/LANtek case.   Defendant filed the instant Motion for Judgment on Pleadings, and Hammond filed a Response to that Motion along with his own Motion for Summary Judgment. Defendant filed a Response to Hammond's Summary Judgment.


**III. DISCUSSION**

Plaintiff is a California resident.  Defendant is a Pennsylvania Corporation.  Federal jurisdiction is predicated upon diversity.

**A.  Choice of Law**

The Court must begin its analysis by determining what law applies to the issues presented by the parties.  The choice of law rules of the forum state – here, Pennsylvania – apply when a federal court sits in diversity.  *See Specialty Surfaces Intern., Inc. v. Continental Cas. Co.*, 609 F.3d 223, 229 (3d Cir. 2010), citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, (1941).  Pennsylvania applies a "flexible rule which permits analysis of the policies and interests underlying the particular issue before the court" and directs courts to apply the law of the state with the "most interest in the problem." *Specialty Surfaces*, 609 F.3d at 229-30, quoting *Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 227 (3d Cir. 2007).

In applying the "flexible rule" noted above, if a court is confronted with a <u>true conflict</u>, it must "first consider each state's contacts with the contract as set forth in the Restatement (Second) of Conflict of Laws. *Specialty Surfaces*, 609 F.3d at 230, citing *Hammersmith*, 480 F.3d at 231; *Compagnie des Bauxites de Guinee v. Argonaut-Midwest Ins. Co.*, 880 F.2d 685, 688-89 (3d Cir. 1989); *Melville v. Am. Home Assurance Co.*, 584 F.2d 1306, 1311 (3d Cir. 1978). A court must next "weigh the contacts on a qualitative scale according to their relation to the policies and interests underlying the [relevant] issue." *Shields v. Consol. Rail Corp.*, 810 F.2d 397, 400 (3d Cir. 1987).

In this case, the "particular issue" before the Court involves the interpretation of certain clauses of an insurance contract executed between Hammond and Defendant to ascertain whether Defendant breached those clauses as Hammond alleges.

**B. Breach of an Insurance Contract**

The United States Court of Appeals for the Third Circuit in *Livornese v. Medical Protective Co.*, noted that when interpreting an insurance contract in a diversity case – such as the instant matter – where a choice of law question presents itself, "[u]nder Pennsylvania choice of law rules, an insurance contract is governed by the law of the state in which the contract was made. An insurance contract is 'made' in the state in which the last act legally necessary to bring the contract into force takes place." *Livornese,* 136 Fed. Appx. 473, 477 (3d Cir. 2005), quoting *J.C. Penney Life Ins. Co. v. Pilosi*, 393 F.3d 356, 360-61 (3d Cir. 2004).

**C. Applicable Law to the Insurance Contract at Issue**

**1. Insurance Carrier's Duty to Defend its Insureds**

As noted in *Speciality Surfaces*, *supra.*, there is no relevant conflict in the laws of California and Pennsylvania with respect to when an insurer has a duty to defend an insured.

609 F.3d at 230. In both jurisdictions, an insurance policy "would be construed to impose a duty to defend if the facts alleged in support of a claim, taken as true, hold the potential for the imposition of a liability for which the insured would be entitled to be indemnified under the policy." *Id.*

As long as a complaint "might or might not" fall within the insurance policy's coverage, the insurance company is required to defend. *Am. & Foreign Ins. Co. v. Jerry's Sport Ctr., Inc.*, 606 Pa. 584, 2 A.3d 526, 541 (2010). The question whether a claim against an insured is potentially covered is answered "by comparing the four corners of the insurance contract to the four corners of the complaint." *Id.* "An insurer may not justifiably refuse to defend a claim against its insured unless it is clear from an examination of the allegations in the complaint and the language of the policy that the claim does not potentially come within the coverage of the policy." *Id.*

Simply put, an insurer has a duty to defend if the complaint filed by the injured party potentially comes within the policy's coverage.

### 2. Insurance Carrier's Duty to Indemnify its Insureds

There is also no relevant conflict in the laws of California and Pennsylvania with certain aspects of the duty to indemnify. Under both California and Pennsylvania law, the duty to defend is a distinct obligation, different from and broader than the duty to indemnify. *See Street Surfing, LLC v. Great American E & S Ins. Co.*, ----F.3d ----, 2014 WL 5904922, *2 (9th Cir. November 14, 2014) (Under California law, the duty to defend is broader than the duty to indemnify; an insurer may owe a duty to defend its insured in an action in which no damages ultimately are awarded.); and *Sikirica v. Nationwide Ins. Co.*, 416 F.3d 214, 225 (3d Cir. 2005) (The duty to defend is a distinct obligation, different from and broader than the duty to

indemnify.). Pennsylvania law also holds that because the duty to defend is broader than the duty to indemnify, there is no duty to indemnify if there is no duty to defend. *Sikirica, supra.,* citing *Mut. Benefit Ins. Co. v. Haver*, 555 Pa. 534, 725 A.2d 743, 746 n. 1 (1999); and *Erie Ins. Exch. v. Claypoole*, 449 Pa.Super. 142, 673 A.2d 348, 356 n. 3 (1996).

### 3. Conclusion on Choice of Law

Here, on the one hand, Defendant argues that there is no real conflict between California law and Pennsylvania law as to when an insurance carrier owes a duty to defend its insureds. See doc. no. 22, p. 12. On the other hand, Hammond does not appear to be arguing that a conflict exists; instead, he simply asserts that Pennsylvania law should control these matters. See doc. no. 25, p. 5-7.

Because this Court finds no conflict among the two states' laws, the Court will apply Pennsylvania law to the issues before it.

### D. Analysis of Pennsylvania Law Related to Hammond's Breach of Contract Claims

Hammond's Complaint asserts two causes of action – breach of contract and statutory "bad faith." The interpretation of the scope of coverage of an insurance contract is a question of law properly decided by the court. *Livornese, supra.*, 136 Fed. Appx. at 476, citing, *J.C. Penney, supra.,* 393 F.3d at 360.

The principles that govern this Court's interpretation of an insurance contract under Pennsylvania law are well settled. "The goal is to ascertain the intent of the parties as manifested by the language of the written instrument." *Alleman v. State Farm Life Ins. Co.,* 508 F.Supp. 2d 452, 455 (W.D. Pa. 2007). Interpretation of an insurance policy is a question of law. *Westport Ins. Corp. v. Bayer*, 284 F.3d 489, 496 (3d Cir. 2002).

In construing the policy, if the words of the policy are clear and unambiguous, the court must give them their plain and ordinary meaning. *Sikirica*, 416 F.3d at 220.(citation omitted). Pennsylvania's parol evidence rule mandates that when a written contract is clear and unequivocal, its meaning must be determined by its contents alone. *Alleman v. State Farm Life Ins. Co*., 334 Fed.Appx. 470, 473 (3d Cir. 2009), citing *East Crossroads Ctr., Inc. v. Mellon-Stuart Co.*, 416 Pa. 229, 205 A.2d 865, 866 (1965). Furthermore, if possible, "a court should interpret the policy so as to avoid ambiguities and give effect to all of its provisions." *Little v. MGIC Indem. Corp.*, 836 F.2d 789, 793 (3d Cir. 1987).

"In determining whether a contract is ambiguous, the court must examine the questionable term or language in the context of the entire policy and decide whether the contract is reasonably susceptible of different constructions and capable of being understood in more than one sense." *Reliance Ins. Co. v. Moessner*, 121 F.3d 895, 900 (3d Cir. 1997) (internal quotation and citation omitted). When a term is ambiguous, and the intention of the parties cannot be discerned from the policy, the court may look to extrinsic evidence of the purpose of the insurance, its subject matter, the situation of the parties, and the circumstances surrounding the making of the contract. *Sikirica,* 416 F.3d at 220. Ambiguous terms must be strictly construed against the insurer, but the policy language must not be tortured to create ambiguities where none exist. *Id*.

Based on this case law, this Court is charged with the responsibility of interpreting the Plaintiff's insurance contract at issue, and must give all clear and unambiguous terms in the contract their plain and ordinary meaning without torturing the language of the contract to create ambiguities where none exist.

Turning to the facts of Hammond's breach of contract claim, Hammond alleges: Defendant breached the insurance contract when it refused to defend and/or indemnify him after Hammond sought coverage: (1) after the declaratory judgment action was filed by TCA and LANtek on December 16, 2011; (2) after TCA and LANtek filed an Amended Complaint on February 3, 2012, which asserted additional claims for breach of contract, conversion, and intentional interference with existing and prospective contractual relations; and (3) after TCA and LANtek filed their Answer to Hammond's remaining counterclaim for breach of contract and requested attorney fees in their prayer for relief. Hammond requested Defendant defend and indemnify him under the general coverage provisions of his "technology professional" insurance policy for his first two requests, and sought defense and indemnification under a "malicious prosecution" clause of his insurance contract for this third request. Hammond made the third request under the malicious prosecution clause of his contract twice, and both times Defendant denied his request. So Hammond requested coverage four times in connection with the earlier, underlying lawsuit, and each time Defendant denied coverage.

### 1. The Insurance Policy's Relevant Provisions

As noted above, TCA and LANtek filed a declaratory judgment action with this Court on December 16, 2011. See *Transportation Compliance Associates, Inc.*, case no. 2:11-cv-01602-AJS. TCA and LANtek also filed an Amended Complaint that asserted tort claims against Hammond. *Id.*

After the filing of the Complaint for declaratory relief and after the filing of the Amended Complaint asserting tort claims against Hammond, Hammond requested for coverage under his insurance policy with Defendant.[1] In response to these requests, Defendant prepared and sent

---

[1] In the instant case, the entire 104-page insurance policy was attached to Defendant's original Answer and Affirmative Defenses. Doc. no. 8-3. When deciding a Motion for Judgment on the Pleadings this

him denial letters – one dated February 10, 2012 and another dated March 16, 2012.  See doc.

nos. 8-1 and 8-2, respectively.  These two letters (combined) set forth the following relevant

excerpts from the insurance policy:

I.   Business Liability

a.   We will pay those sums that the insured becomes legally
     obligated  to pay as damages because of "bodily injury",
     "property damage" or "personal and advertising injury" to
     which this insurance  applies.  We will have the right and
     duty to defend the insured against any "suit" seeking those
     damages . . .

b.   This insurance applies to
     (1)  "bodily injury" and "properly damage" only if:

          (a)  The "bodily injury" or "property  damage"
               is caused by an "occurrence" that takes
               place in the "coverage territory"; and
          (b)  The "bodily injury" or "property damage"
               occurs during the policy period.

     (2)  To:

          (a)  "Personal injury" caused by an offense
               arising out of your business, excluding
               advertising, publishing, broadcasting or
               telecasting done by or for you;

          (b)  "Advertising injury" caused by an offense
               committed in the course of advertising your
               goods, products or services;

                    *          *          *

---

Court may consider ". . . the pleadings and attached exhibits, undisputedly authentic documents attached
to the motion for judgment on the pleadings if plaintiffs' claims are based on the documents, and matters
of public record."  *Bennetta v. U.S. Airways Group, Inc.*, 2014 WL 1887293, *4 (E.D. Pa. May 12, 2014);
see also *NCMIC Ins. Co. v. Walcott*, --- F.Supp.2d ----, 2014 WL 4375560, *1 (E.D. Pa. September 3,
2014) (When deciding a Rule 12(c) motion, a court is allowed to consider "the pleadings and attached
exhibits, undisputedly authentic documents attached to the motion for judgment on the pleadings if
plaintiffs' claims are based on the documents, and matters of public record" in making its decision.).
Thus, because Hammond's (Plaintiff's) claims are based on the terms set forth in the insurance policy and
because the policy was attached to a pleading, the Court has carefully considered it in deciding the
outcome of these matters.

"Advertising Injury" is defined as:

1. "Advertising injury" means injury arising out of one or more of the following offenses:

   a. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;
   b. Oral or written publication of material that violates a person's right of privacy;
   c. Misappropriation of advertising ideas or style of doing business; or
   d. Infringement of copyright, title or slogan.

"Bodily Injury" is defined as:

2. "Bodily Injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

"Occurrence" is defined as:

12. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

"Personal Injury" is defined as:

13. "Personal injury" means injury, other than "bodily injury", arising out of one or more of the following offenses:

   a. False arrest, detention or imprisonment;
   b. Malicious prosecution;
   c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, by or on behalf of its owner, landlord or lessor;
   d. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

e.  Oral or written publication of material that violates a person's right of privacy;

"Property Damage," in turn, is defined as:

17.  "Property damage" means:

a.  Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b.  Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

The "INSURING AGREEMENT" under the Technology Professional Liability Coverage portion of the policy reads:

A.  The Company will pay on behalf of the Insured any Loss excess of the deductible not exceeding the Limit of Liability to which this coverage applies that the Insured shall become legally obligated to pay because of Claims first made against the Insured during the Policy Period or, if applicable, during any Extension Period, for Wrongful Acts of an Insured or from an Intellectual Property Claim arising out of a Wrongful Act of an Insured.

Under the "DEFINITIONS" section of the same portion of this policy, the relevant policy definitions read:

B.  Claim(s) means a demand for money as compensation for a Wrongful Act including any judicial or administrative proceeding initiated against any Insured seeking to hold such Insured responsible for a Wrongful Act, including any appeal therefrom.

14

*     *     *

E.     Computer Technology Services means information technology services performed by any Insured for others for a fee, including but not limited to computer consulting, systems analysis, installation, programming, data processing, system integration, software development and design, disaster recovery, record retrieval, management and repair or maintenance of computer products, networks or systems and education and training services related to the above.

*     *     *

N.     Professional Services means services rendered by an Insured for others for a fee solely in the conduct of Computer Technology Services and/or Internet Services.

O.     Wrongful Act means any actual or alleged error, omission, neglect or breach of duty, Personal Injury, unintentional introduction of a Malicious Code or unintentional failure to prevent unauthorized access to or use of any electronic system or program of a third party;
1.     by the Named Insured or
2.     by the Named Insured's partner(s), member(s) or individual(s) employed by the Named Insured arising solely from their duties conducted on behalf of the Named Insured.
3.     asserted against any Named Insured partner, member or individual hired by the Named Insured because of an actual or alleged error, omission, neglect or breach of duty, Personal Injury, unintentional introduction of a malicious code or unintentional failure to prevent unauthorized access to or use of any electronic system or program of a third party by the Named Insured.

*     *     *

L.     Personal Injury means a Claim alleging wrongful entry, wrongful eviction, wrongful detention, false arrest, false imprisonment, libel, slander or defamation, advertising injury or violation of any right of privacy.

**2. Hammond's Request for Coverage following the filing of the Complaint in the Earlier, Underlying Case**

The original Complaint sought a declaration from this Court that: (1) neither TCA and

LANtek violated any legally protected right of Hammond in any intellectual property he owned;

(2) Hammond owned no legally protectable intellectual property as referenced in his attorney's letters sent to TCA and LANtek; (3) Hammond held no interest in the nature of a partnership or license agreement; and (4) Hammond had to return to TCA and LANtek all information that related in any way to work Hammond did for TCA, LANtek or any of their clients.

Based on the nature of this lawsuit and the specific declaratory relief it sought, and construing the unambiguous terms of coverage set forth above, the Court concludes that Defendant properly denied Hammond coverage following the filing of the declaratory judgment complaint on December 16, 2011. The terms of the policy state that Defendant "will pay on behalf of [Hammond] any Loss . . . to which this coverage applies that [Hammond] shall become legally obligated to pay because of Claims first made against [him] during the Policy Period . . . for Wrongful Acts of [Hammond] or from an Intellectual Property Claim arising out of a Wrongful Act of [Hammond]." A "Claim" is defined as "a demand for money as compensation for a Wrongful Act including any judicial . . . proceeding initiated against [Hammond] seeking to hold such [Hammond] responsible for a Wrongful Act . . . ." A "Wrongful Act" is defined as "any actual or alleged error, omission, neglect or breach of duty, Personal Injury, unintentional introduction of a Malicious Code or unintentional failure to prevent unauthorized access to or use of any electronic system or program of a third party[.]"

Because no claim – no demand for money as compensation for a Wrongful Act (meaning an error, omission, neglect, etc.) – was made by TCA and LANtek against Hammond upon the filing of the Declaratory Judgment Complaint, there was nothing set forth in that Complaint which triggered the application of coverage under the business/technology insurance policy issued by Defendant. At the time the Declaratory Judgment Complaint was filed in the earlier, underlying matter, TCA and LANtek were only seeking a ruling from this Court that they had

not violated any of Hammond's alleged intellectual property rights and that he had to return their customers' information to them.

This Court concludes based on the allegations of the initial Complaint filed in the earlier, underlying lawsuit, Defendant did not owe a duty to defend Hammond because the initial Complaint filed by the TCA and LANtek did not potentially come within the insurance policy's coverage.

### 3. Hammond's Request for Coverage following the filing of the Amended Complaint in the Earlier, Underlying Case

The Amended Complaint altered the lawsuit previously filed by TCA and LANtek in that it advanced additional claims for breach of contract, conversion, and intentional interference with existing and prospective contractual relations. Under the Amended Complaint, TCA and LANtek sued Hammond for monetary damages. Hammond again requested insurance coverage from Defendant.

Again, by comparing the four corners of the insurance contract to the four corners of this Amended Complaint, this Court concludes that Defendant properly denied Hammond's coverage request – including the request to defend him against TCA's and LANtek's new claims.

First, as noted above, the terms of the policy require Defendant to "pay on behalf of [Hammond] any Loss . . . to which this coverage applies that [Hammond] shall become legally obligated to pay because of Claims first made against [him] during the Policy Period . . . for Wrongful Acts of [Hammond] or from an Intellectual Property Claim arising out of a Wrongful Act of [Hammond]." "Claim" is defined as "a demand for money as compensation for a Wrongful Act including any judicial . . . proceeding initiated against [Hammond] seeking to hold such [Hammond] responsible for a Wrongful Act . . .". A "Wrongful Act" is defined as "any actual or alleged error, omission, neglect or breach of duty, Personal Injury, unintentional

17

introduction of a Malicious Code or unintentional failure to prevent unauthorized access to or use of any electronic system or program of a third party[.]"

Even though the Amended Complaint now raised tort claims which called for monetary damages, the policy's coverage was only triggered if the damages were incurred due to a "Wrongful Act" by Hammond. Again, the policy defines "Wrongful Act" as "any actual or alleged error, omission, neglect or breach of duty, Personal Injury, unintentional introduction of a Malicious Code or unintentional failure to prevent unauthorized access to or use of any electronic system or program of a third party[.]"

Nothing in the Amended Complaint suggests that any of the tort claims asserted by TCA and LANtek arose because Hammond made an actual or alleged error or omission or because of neglect on his part or a breach of duty. The Amended Complaint does not contain allegations suggesting that TCA and/or LANtek were entitled to damages from Hammond due to "Personal Injury" as defined by the policy, nor because of any Malicious Code Hammond unintentionally introduced into his program. In short, the Amended Complaint advanced causes of action against Hammond (breach of contract, conversion, and intentional interference with existing and prospective contractual relations) based upon the actions he took when trying to either resurrect his failed business venture with TCA, and/or exact revenge or gain leverage against TCA when that business venture soured.

Under either scenario, the insurance policy provides no coverage for this sort of dispute. The dispute that erupted between TCA and Hammond and ultimately led to Amended Complaint being filed in the earlier, underlying lawsuit, can best be described as failed, unconsummated business venture. Thus, Defendant did not err in denying coverage given the plain and unambigous terms of its policy.

### 4. Hammond's Requests for Coverage following TCA/LANtek's Answer to His Counterclaims Seeking Attorneys Fees

Finally, Hammond made two additional requests for coverage after TCA and LANtek filed an Answer to his Counterclaim for breach of contract. In the "Prayer for Relief" portion of their Answer to Hammond's Counterclaim, TCA and LANtek requested attorney fees. See doc. no. 95 in case no. 11-cv-1602 ("the earlier, underlying case").

This time, when Hammond approached Defendant, he sought coverage under the "malicious prosecution" clause of his insurance contract, claiming that the request for attorney fees constituted "malicious prosecution." Defendant denied his claim. Prior to settling this earlier, underlying lawsuit, Hammond renewed his request for defense and indemnification under the malicious prosecution clause of his policy, but again, his claim was denied.

Here, in his Response to the Motion for Judgment on the Pleadings, Hammond argues that ". . . defense and/or indemnification was 'triggered' under the malicious prosecution' clause of [the] insurance policy . . . ." Doc. no. 25, p. 10. In support of this argument, Hammond points to Defendant's Prayer for Relief in Defendant's Answer to his Counterclaim in the underlying case which requested ". . . attorney fees . . . for Hammond's bad faith and other wrongful conduct . . . pursuant to *inter alia* 12 Pa.C.S. § 5305 and 17 U.S.C. § 505." Id., p. 10-11. See also doc. 95, p. 9, in the earlier, underlying case. In addition, Hammond points to Defendant's responses to his requests for admissions in the earlier, underlying lawsuit, wherein the insurer stated that it sought ". . . from Hammond the recovery specified in ¶D of the Prayer for Relief . . . based on the conduct that also supports a malicious prosecution and/or abuse of civil proceedings claim." Doc. no. 25, p. 11.

In order to determine whether Hammond was entitled (at a minimum) to a defense by the insurance company due to TCA's "malicious prosecution" reference in its Answer to

Hammond's Counterclaim in the earlier, underlying case, the Court begins by reviewing the insurance policy itself. The only portion of Hammond's insurance policy which references "malicious prosecution" can be found under the "Businessowners [sic.] Coverage" portion of the policy and is not part of the Technology Professional Liability Coverage portion of the policy. In order for any coverage to be triggered under the "Businessowners Coverage" portion of his insurance policy, TCA's allegations in its Answer to Hammond's Counterclaim had to first meet the "Businessowners Coverage" definition of "occurrence."

"Section II" of the "Businessowners Coverage" of the policy describes the coverage available for certain types of liability – notably, "business liability." Doc. no. 8-3, p. 35. In this section of the policy, "occurrence" is defined to mean ". . . an accident, including continuous or repeated exposure to substantially the same general harmful conditions." Id., p. 48. This same section of the policy states that the ". . . insurance applies: ". . . (2) [t]o "personal and advertising injury" caused by an offense arising out of your business . . .". Id., p. 35.

In addition, this section of the policy indicates that the insurance company ". . . will pay those sums that the insured become legally obligated to pay as damages because of . . . 'personal and advertising injury' to which the insurance applies." Id. The term "malicious prosecution" is found within the definition of "personal and advertising injury" as follows:

"Personal Injury" is defined as:

13.    "Personal injury" means injury, other than "bodily injury", arising out of one or more of the following offenses:

a.    False arrest, detention or imprisonment;
b.    Malicious prosecution;  . . .

Id., p. 48. Thus, boiled down, the insurance policy indicates the insurance company would pay those sums that Hammond became legally obligated to pay as damages because of injury arising out of malicious prosecution.

Finally, this same section ("Section II" - "Businessowners Coverage") excludes coverage for any "loss, cost, or expense" arising out of any "infringement of copyright, patent, trademark, trade secret or other intellectual property rights."

As noted above, TCA and LANtek never sued Hammond for "malicious prosecution;" rather, TCA and LANtek claimed that they were entitled to attorney fees for Hammond's alleged bad faith and other wrongful conduct pursuant to 12 Pa.C.S.A. § 5305 and 17 U.S.C.A. § 505. The state statute allows for attorney fees to be awarded when misappropriation of trade secrets is done in bad faith. 12 Pa.C.S.A. § 5305 ("A court may award reasonable attorney fees, expenses and costs to the prevailing party: (1) if a claim of misappropriation [of trade secrets] is made in bad faith; (2) a motion to terminate an injunction is made or resisted in bad faith; or (3) willful and malicious misappropriation exists."). The federal statute provides attorney fees in copyright infringement cases. 17 U.S.C.A. § 505 (Remedies for copyright infringement: ". . . the court may also award a reasonable attorney's fee to the prevailing party as part of the costs.").

Thus, given TCA's/LANtek's basis for their request for attorney fees in their prayer for relief (not a separate claim filed against Hammond), was predicated upon Hammond's alleged misappropriation of trade secrets made in bad faith and/or copyright infringement, Defendant properly disclaimed coverage for two reasons. First, the demand for attorney fees was not an independent cause of action triggering coverage. Second, the policy itself specifically excluded coverage as noted above. Accordingly, the Court concludes as a matter of law based on the interpretation of the law and the specific clauses of this insurance policy that Defendant did not

breach its insurance contract with Hammond when it disclaimed Hammond's coverage request under the "malicious prosecution" clause of the policy.

### E. Conclusion on Breach of Contract

Because this Court has concluded that Defendant did not breach any portion of its insurance contract with Hammond, the Court concludes that there was no breach of contract, and accordingly, finds that Hammond's claim for breach of contract fails. The Court agrees with Defendant that judgment on the pleadings in favor of Defendant is appropriate with respect to this claim.

### F. Bad Faith

Next, Defendant requested judgment (in its favor) on the pleadings related to Hammond's bad faith claim.

The United States Court of Appeals for the Third Circuit, has adopted the following definition of "bad faith" as follows:

> "Bad faith" on part of insurer is any frivolous or unfounded refusal to pay proceeds of a policy; it is not necessary that such refusal be fraudulent. For purposes of an action against an insurer for failure to pay a claim, such conduct imports a dishonest purpose and means a breach of a known duty (*i.e.*, good faith and fair dealing), through some motive of self-interest or ill will; mere negligence or bad judgment is not bad faith.

*Polselli v. Nationwide Mut. Fire Ins. Co.*, 23 F.3d 747, 751 (3d Cir.1994). The Court in *Polselli* went on to state that mere negligence on the part of the insurer is insufficient to constitute bad faith; recklessness, however can support a finding of bad faith. *Id.*

More recently, the Court of Appeals held that under Pennsylvania law, a court should reject a bad faith claim where "any reasonable basis exist[s] for the insurer's conduct." *Livornese, supra,* 136 Fed. Appx. at 480. "Ultimately, in order to recover on a bad faith claim, the insured must prove: (1) that the insurer did not have a reasonable basis for denying benefits

under the policy; and (2) that the insurer knew of or recklessly disregarded its lack of a reasonable basis in denying the claim." *Nw. Mut. Life Ins. Co. v. Babayan*, 430 F.3d 121, 137 (3d Cir. 2005).

Finally, the Court of Appeals for the Third Circuit has held that under Pennsylvania law, if a court determines that there is no coverage, the insurance carrier had "good cause to refuse to defend." *Frog, Switch & Mfg. Co., Inc. v. Travelers Ins. Co.*, 193 F.3d 742, 751 (3d Cir. 1999).

Based upon the foregoing analysis of the breach of contract claim and this Court's conclusion that no such breach occurred, the Court concludes no bad faith claim as that term is defined by law can survive the instant Motion for Judgment on the Pleadings. In addition, the Court notes that Plaintiff's bad faith claim would be barred by Pennsylvania's two-year statute of limitations.


## IV. CONCLUSION

Based on the foregoing law and authority, the Court will grant Defendant's Motion for Judgment on the Pleadings. In doing so, Hammond's Motion for Summary Judgment will be denied as moot in light of the Court's ruling on Defendant's Motion for Judgment on the Pleadings. An appropriate Order follows.

s/ Arthur J. Schwab
Arthur J. Schwab
United States District Judge


cc:    All Registered ECF Counsel and Parties